USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 10/17/2024

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------- X
                                       :

MAXEN CAPITAL ADVISORS, LTD.,       :
                                         :

                          Plaintiff,    :

                                         :

                     -v-                :                   1:24-cv-2231-GHW

                                         :

PURE LITHIUM CORPORATION,        :                 MEMORANDUM

                                         :               OPINION & ORDER

                          Defendant.   :

                                         :

----------------------------------------------------------- X

GREGORY H. WOODS, United States District Judge:

      Plaintiff MaxEn Capital Advisors, Ltd. ("MaxEn"), a financial advisory firm, agreed to help

Pure Lithium Corporation ("Pure Lithium") raise capital. The parties entered into an agreement

letter that engaged MaxEn to solicit investments from a list of "target" investors. MaxEn was

entitled to a success fee if it raised money from one of those target investors. During the

engagement, the CEO of Pure Lithium sent an email to MaxEn's general counsel, asking that

MaxEn send a presentation to a potential investor who was not on that target list. The general

counsel responded with a casual response: "Agreed." This case resulted from that off-hand reply.

For when Pure Lithium later closed a deal with the investor, it asserted that MaxEn was not entitled

to a success fee because the investor was not listed in the engagement letter, and because, in its view,

the short email exchange between the companies did not effectively amend the engagement letter to

add him.

      MaxEn brought this action to obtain the success fee that it claims it is due. The brief email

exchange between the parties was not effective to amend the engagement letter. But because the

parties' course of conduct outlined in the complaint adequately pleads the existence of an unwritten

amendment to the engagement letter, Defendant's motion to dismiss is DENIED.

## I.    BACKGROUND

### A.    Facts[1]

#### 1.    The Parties

Plaintiff MaxEn Capital Advisors, Ltd. ("Plaintiff" or "MaxEn") is a "boutique merchant and investment bank that provides financial advisory services to companies." Dkt. No. 1 ("Compl.") ¶ 6. MaxEn is incorporated in the British Virgin Islands and its principal place of business is located in Houston, Texas. *Id.*

Defendant Pure Lithium Corporation ("Defendant" or "Pure Lithium") is "an early-stage technology company that is developing next generation metal lithium batteries." *Id.* ¶ 7. Pure Lithium is incorporated in Delaware and its principal place of business is located in Charlestown, Massachusetts. *Id.*

#### 2.    The Parties' Financial Advisory Engagement Agreement

In January 2021, Pure Lithium was running short on cash. *Id.* ¶ 3. It retained MaxEn, which had a "substantial number of contacts among investors in the energy sector," to help it raise capital. To document the relationship, on January 21, 2021, the parties entered into the engagement agreement that is at the heart of this case. Dkt. No. 23-1 (the "Engagement Letter").

Pursuant to the Engagement Letter, Pure Lithium engaged MaxEn "on an exclusive basis with regard to raising capital from the list of target investors (the 'Investor Target List' or the 'Investors') set forth below, and the Advisor [MaxEn] agrees to provide the Services with respect to

---

[1] Unless otherwise noted, the facts are drawn from the Complaint. Dkt. No. 1. The facts are accepted as true for purposes of this motion to dismiss. *See, e.g., Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002). However, "[t]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Moreover, "[i]f a document relied on in the complaint contradicts allegations in the complaint, the document, not the allegations, control, and the court need not accept the allegations in the complaint as true." *Poindexter v. EMI Record Grp. Inc.*, 2012 WL 1027639, at *2 (S.D.N.Y. Mar. 27, 2012).

the Investors." Engagement Letter at 6.[2]  In its complaint, MaxEn outlined the services that it was

expected to provide pursuant to the Engagement Letter as follows:

> MaxEn was to contact investors that it had a relationship with to determine
> if these were interested in investing with Pure Lithium.  MaxEn would then
> introduce investors who were interested in exploring the investment opportunity to
> Pure Lithium's management team so that the investors could further explore the
> possibility of investing in Pure Lithium.

Compl. ¶ 13. All of the parties agree that MaxEn's services were limited to working to solicit

investments from the specific group of "Investors" listed in the Engagement Letter.  And, most

importantly, they agree that the list did not include Robert Friedland, whose later investment

triggered this dispute.

The Engagement Letter provided for MaxEn to be compensated for its work.  Pure Lithium

agreed to pay MaxEn an up-front engagement fee of $50,000 and modest monthly retainer payments

of $5,000 for the next four months.  Engagement Letter at 6.  MaxEn was also entitled to be paid a

"closing fee" for transactions within the scope of its engagement.  *Id.*[3]  The Engagement Letter

contained a "fee tail" provision that required MaxEn to be paid for certain transactions that closed

after its engagement terminated.  *Id.*  By its express terms, the fee tail only applied to investments by

one of the listed "Investors" consummated withing 12 months of the termination of MaxEn's

engagement.  *Id.*[4]

---

[2] The Engagement Letter lacks page numbers.  References to pages in the Engagement Letter are to the ECF pagination.
[3]  Engagement Letter at 6 ("As and for a closing fee hereunder:  a.  For any equity or equity-linked private placement or any credit extension established by way of a convertible debt offering or otherwise, the Client shall pay the Advisor in immediately available funds at each closing a cash fee in U.S. dollars equal to 6% of the cash or cash-equivalent investment by any one (1) or more of the Investors, irrespective of the form of the investment vehicle utilized for the Transaction(s).  b.  As additional compensation, the Advisor shall be granted equity common stock for each Closing equal to 6% of the number of common shares or equivalent membership interests of the Company acquired by any one (1) or more of the Investors at each and every Closing.").
[4]  Engagement Letter at 6 ("The fees described above shall be paid notwithstanding the Termination or expiry of this Agreement if the Client completes an equity or equity-linked private placement or convertible debt or similar facility as contemplated in (a) above within twelve (12) months from the date of expiry or termination of this Agreement with any of the Investors, irrespective of the form of the investment vehicle utilized for the Transaction.").

The Engagement Letter was governed by New York law.  *Id.* at 8.  Among the agreement's general provisions was one that required that all amendments to the agreement be made in writing. *Id.* at 9 ("No purported waiver or modification of any of the terms of this Agreement will be valid unless made in writing and signed by the parties hereto.") (the "Written Modifications Only Clause").  And the Engagement Letter contained an integration clause.  *Id.*[5]

The Engagement Letter was originally scheduled to expire four months after its execution. *Id.* at 7 ("This Agreement will expire four (4) months after it is executed unless the parties mutually agree, in writing, to renew this Agreement . . . .").  However, by its terms, the agreement could be extended by mutual agreement of the parties.  *Id.*  The parties agreed to extend the term of MaxEn's engagement twice, through December 31, 2021.  Compl. ¶¶ 19-20.  "Defendant then continued MaxEn's engagement through March 31, 2022 by continuing to pay MaxEn's monthly fee through the month of March 2022."  *Id.* ¶ 21.  In March 2022, Pure Lithium sent MaxEn a "termination letter," informing MaxEn that "the parties' relationship would terminate at the end of March 2022."[6] *Id.*

### 3.  MaxEn Solicits An Investment From Mr. Friedland

Robert Friedland was the CEO of Ivanhoe Capital Corporation, "a prominent mining and investment company and established investor in the energy sector."  Compl. 15.  On November 4, 2021, Emilie Bodoin, Pure Lithium's CEO, sent an email to Howard Margulis—a Senior Managing Director of MaxEn and the company's General Counsel.  *Id.*  Ms. Bodoin's email read in full as follows:

> Hi Howard,

---

[5] Engagement Letter at 9 ("This Agreement constitutes and embodies the entire understanding and Agreement of the parties hereto relating to the subject matter hereof, and there are no other prior or contemporaneous agreements or understandings, written or oral, in effect between the parties relating to the subject matter hereof.").

[6] As noted, the Engagement Letter provides for extensions only with the mutual written agreement of the parties.  For purposes of this opinion, however, the Court accepts as true Plaintiff's allegation that the term was effectively extended unilaterally by Defendant without a writing.

> Gentle reminder to please send deck out to Robert Friedland.  On the panel
> for SES yesterday – this will resonate him.  Maybe it is better not to co-
> mingle with Standard so he can stay focused on PL?
>
> Thanks,
> E

Dkt. No. 23-3 (the "Email Exchange").

Mr. Margulis responded later that day by email with a very cursory response:

> Agreed.
>
> Best regards,
>
> Howard

*Id.*  Following his name was a digital signature stamp, identifying Howard as "Howard L. Margulis,

Esq. Senior Managing Director & General Counsel MaxEn Capital Advisors, Ltd.," together with

his contact information.  *Id.*

In its complaint, MaxEn characterizes this communication as a request by Pure Lithium "to

expand the list of targeted investors to include" Mr. Friedland.  Compl. ¶¶ 15, 23.  And MaxEn

describes Mr. Margulis' response to Ms. Bodoin's email as an agreement by MaxEn to expand the

list of targeted investors listed in the Engagement Letter to include Mr. Friedland.  *Id.* ¶ 23.

In response to Ms. Bodoin's email, MaxEn, "promptly initiated discussions with Mr.

Friedland and sent him the investor deck." *Id.*  MaxEn followed up with emails and calls to Mr.

Friedland and "arranged for Mr. Friedland and his colleagues to make an on-site visit at Pure

Lithium's headquarters . . . on December 13, 2021." *Id.*  Mr. Friedland spent several days meeting

with Pure Lithium.  Although the connection with Mr. Friedland started with Ms. Bodoin's email,

MaxEn's complaint credits all of this to "MaxEn's introduction." *Id.*

Following Mr. Friedland's meeting with Pure Lithium, Mr. Friedland became very interested

in investing in Pure Lithium . . . ." *Id.* ¶ 24.  Pure Lithium and Mr. Friedland began discussions

about a potential equity investment in Pure Lithium.  *Id.*  MaxEn does not allege that it was involved in those discussions.

### 4. Mr. Friedland Invests But Pure Lithium Does not Pay MaxEn a Success Fee

The Engagement Letter between MaxEn and Pure Lithium expired at the end of March 2022.  *Id.* ¶ 25.  Less than a month later, in April 2022, Mr. Friedland made his first investment in Pure Lithium through one of his companies, Ivanhoe Capital Corporation ("Ivanhoe").  *Id.* ¶ 26.  Ivanhoe invested $5.9 million in Pure Lithium.  And in March 2023, "Mr. Friedland made a second investment in Pure Lithium in the amount of $5.9 million, also through a company managed, controlled or affiliated with him."  *Id.* ¶ 27.  Pure Lithium did not notify MaxEn of either investment.  *Id.* ¶¶ 26, 27.

When MaxEn learned of Mr. Friedland's investments in Pure Lithium, it requested that Pure Lithium pay it the success fee that it believed it was due.  *Id.* ¶ 28.  "On October 4, 2023, MaxEn's counsel sent Pure Lithium a demand letter seeking payment for its fee arising out of Ivanhoe's investment in Pure Lithium . . . ."  *Id.*  Pure Lithium did not respond to the request.  *Id.* ¶ 29.  And it did not pay the fee that MaxEn believed to be due.  *Id.*  Asserting that "Pure Lithium has received significant benefits as a result of the introduction that it requested from MaxEn," MaxEn then "commenced this action to enforce its Agreement with Defendant."  *Id.* ¶¶ 29, 30.

### B. Procedural History

MaxEn filed this action on March 25, 2024.  Dkt. No. 1.  In its complaint, MaxEn asserts four causes of action.  Count I asserts that Pure Lithium breached the Engagement Letter with MaxEn when it failed to pay MaxEn a success fee.  ¶¶ 31–37.  Count II asserts a claim for breach of an implied agreement.  *Id.* ¶¶ 38–47.  The complaint alleges that as a result of the parties' course of conduct "an implied agreement was established between Plaintiff and Defendant . . . pursuant to which Plaintiff was to endeavor to introduce Defendant to Mr. Friedland and try to facilitate an

investment by companies associated with him in Pure Lithium, and if Mr. Friedland made such an investment, Defendant would pay Plaintiff the compensation set forth in the [Engagement Letter]." *Id.*  Count III asserts a claim for quantum meruit.  *Id.* ¶¶ 48–55.  In it MaxEn claims that it should be awarded damages that compensates it for the reasonable value of its services.  Count IV asserts a claim for unjust enrichment.  *Id.* ¶¶ 56–60.  MaxEn claims that Pure Lithium was "unjustly enriched by accepting the benefits conferred on it by Plaintiff, but by refusing to pay Plaintiff the fee that it earned."  *Id.* ¶ 59.  Like Count II, Counts III and IV are pleaded in the alternative, in the event that it is determined that no express contract covered MaxEn's efforts to solicit an investment from Mr. Friedland.

Pure Lithium filed this motion to dismiss the complaint on June 12, 2024.  Dkt. No. 21 (notice of motion), Dkt. No. 22 (memorandum of law or "D. Mem."), Dkt. No. 23 (declaration).  In its motion, Pure Lithium argues first that the plaintiff's breach of contract claim cannot proceed because Mr. Friedland was not on the list of "Investors" contained in the Engagement Letter and the no fee was owed to anyone not included in that list.  D. Mem. at 6.  The defendant argued that the Email Exchange was not effective to amend the Engagement Letter.  That is because, the defendant argues, the communication did not express an intention to modify the agreement.  *Id.* at 9 ("Here, there is no question that the November 4 Email Exchange does not unambiguously amend the Agreement.  There is no reference to the Agreement, the Investor Target List, or any modification of the Agreement in Ms. Bodoin's email.").

Pure Lithium argues that the implied covenant claim pleaded in Count II is inadequately pleaded because the subject of the implied contract is covered by the express terms of the Engagement Letter.  *Id.*  The defendant argues that because "Plaintiff seeks to be compensated on the same terms set forth in the Agreement for allegedly performing the same services it agreed to provide under the Agreement," the implied covenant claim must be dismissed.  *Id.* at 10.  And

finally, the defendant argues that both MaxEn's claims for quantum meruit and unjust enrichment should be dismissed because they are duplicative of its claim for breach of contract.  Pure Lithium argues that the claims are attempts to "plead around the Agreement's amendment requirements (which were not met) in an attempt to receive compensation for the alleged performance of services contemplated by the Agreement but for an investor not included among the Agreement's Targeted Investors."  *Id.* at 11.

Plaintiff filed its opposition to the motion on July 11, 2024.  Dkt. No. 29 (memorandum of law or "Opp."); Dkt. No. 30 ("Gershman Decl.").  In its opposition, MaxEn accepts that in order to be compensated pursuant to the Engagement Letter, Mr. Friedland needed to be added to the list of targeted investors.  However, MaxEn argues that "the parties modified their contract to include Friedland as a targeted investor as evidenced by their email exchange, their oral conversations, their course of conduct and partial performance, Plaintiff's reliance on the modification, and the investor deck Defendant asked to be forwarded to Friedland, which listed MaxEn as the contact person for the transaction."  Opp. at 8.  MaxEn recognizes that as a general matter, New York law enforces limitations on oral amendments to contracts, such as the one found in the Engagement Letter, but it argues that "even if there is a no oral modification provision in the contract and the parties do not have a written modification, courts will still hold there has been a valid modification if there is partial performance by the parties that is unequivocally referable to the modification . . . ."  *Id.*  MaxEn argues that it would not have sent out the investor deck to Mr. Friedland and done the work to solicit his investment if it had not agreed to amend the Engagement Letter—"there is no other plausible explanation for them, as the only other explanation is that MaxEn was doing the work for free, which is clearly not plausible."  *Id.* at 3–4.  As a result, MaxEn contends that the question of whether the contract was effectively amended must be left for the finder of fact to resolve at a later stage in the case.

MaxEn argues that its quasi-contract claims should not be dismissed as duplicative.  Opp. at 20.  The plaintiff agrees that if it is determined that the Engagement Letter "was modified to include Friedland as a targeted investor, then the implied claim would be duplicative and be dismissed." *Id.* at 21.  However, until that issue is resolved, MaxEn claims, the implied covenant claim is properly pleaded in the alternative. *Id.*  MaxEn makes much the same argument with respect to the motion to dismiss its quantum meruit and unjust enrichment claims. *Id.* at 17.  For so long as "there are disputes about the validity of the alleged modification of the Agreement . . . .  Plaintiff's quasi-contract claims are not duplicative of the contract claim . . . because they are alleged in the alternative . . . ." *Id.*

Pure Lithium filed its reply on July 22, 2024.  Dkt. No. 31 ("Reply").  In it, Pure Lithium refutes all of the arguments MaxEn advanced in its opposition.  In particular, the defendant responds to the argument that the question of whether the Engagement Letter was amended must be resolved by a finder of fact.  Pure Lithium points out that the only allegations regarding the formation of the alleged agreement is the Email Exchange, and that courts can evaluate writings to determine whether they are sufficient to modify a contract. *Id.* at 2–5.  Pure Lithium also argued, for the first time, that no new consideration had been offered to support a modification to the contract. *Id.* at 6.  The plaintiff responded to that new argument in a brief sur-reply on August 2, 2024.  Dkt. No. 34.

## II.    LEGAL STANDARD

A complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  A defendant may move to dismiss for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  In deciding a motion to dismiss under Rule 12(b)(6), the Court accepts as true all well-pleaded factual allegations and draws all

reasonable inferences in the plaintiff's favor.  *See Palin v. N.Y. Times Co.*, 940 F.3d 804, 810 (2d Cir. 2019) (quoting *Elias v. Rolling Stone LLC*, 872 F.3d 97, 104 (2d Cir. 2017)).

Although Rule 8 "does not require 'detailed factual allegations,' . . . it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Id.* (quoting *Twombly*, 550 U.S. at 555).  To survive a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).  A claim is facially plausible when a plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556).  Determining whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010).  "It is well established that a pleading is deemed to include any 'written instrument' that is attached to it as 'an exhibit,' or is incorporated in it by reference." *Lynch v. City of New York*, 952 F.3d 67, 79 (2d Cir. 2020) (citation omitted).  "The term 'written instrument' generally refers to a legal document that defines rights, duties, entitlements, or liabilities, such as a statute, contract, will, promissory note, or share certificate." *Id.* (cleaned up) (citations omitted).  However, "[l]imited quotation from or reference to documents that may constitute relevant evidence in a case is not enough to incorporate those documents, wholesale, into the complaint." *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004) (citation omitted).  Courts may also

consider "matters of which judicial notice may be taken." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (citation omitted).

A court may consider documents that are "integral to" the complaint. *Id.* For a document to meet this exception to the general principle that a court may not consider documents outside of the pleadings without converting the motion to one for summary judgment, the complaint must rely heavily upon its terms and effects. *See DiFolco*, 622 F.3d at 111 ("Where a document is not incorporated by reference, the court may never[the]less consider it where the complaint relies heavily upon its terms and effect, thereby rendering the document integral to the complaint." (internal quotation marks omitted)). "However, even if a document is integral to the complaint, it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document." *Id.* (internal quotation marks omitted) (quoting *Faulkner v. Beer*, 463 F.3d 130, 134 (2d Cir. 2006)). "It must also be clear that there exist no material disputed issues of fact regarding the relevance of the document." *Id.* "In most instances where this exception is recognized, the incorporated material is a contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls, but which for some reason . . . was not attached to the complaint." *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006).

Pure Lithium's motion to dismiss is accompanied by the declaration of Cassandra M. Vogel, which attaches two exhibits. *See* Dkt. No. 23. The exhibits are the Engagement Letter and the Email Exchange. The Court has considered both documents. The Engagement Letter is a written instrument and is the basis for the plaintiff's claims. It is incorporated by reference into the complaint and may properly be considered on a motion to dismiss. *See Lynch*, 952 F.3d at 79; *see also* Fed. R. Civ. P. 10(c). The Email Exchange is specifically referenced in the complaint. Compl. ¶ 15.

MaxEn's Opposition is accompanied by the declaration of Joseph A. Gershman. That declaration attaches two pages of "the Investment Deck sent by MaxEn to Robert Friedland."

11

Gershman Decl. ¶ 2.  These pages come from the investment presentation referenced in the complaint, Compl. ¶¶ 4, 15, 23, and in the Email Exchange.  This document is not integral to the complaint.  While the deck is referenced in the complaint, the complaint does not rely "heavily upon its terms and effect . . . ."  *See DiFolco*, 622 F.3d at 111.  MaxEn has presented the document in order to support the contention in its Opposition that the fact that the deck refenced MaxEn signifies that MaxEn and Pure Lithium agreed to amend the Engagement Letter.  Opposition at 8 ("the parties modified their contract to include Friedland as a targeted investor as evidenced by . . . the investor deck Defendant asked to be forwarded to Friedland, which listed MaxEn as the contact person for the transaction.")[7].  The slide deck is not, however "a contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls, but which for some reason . . . was not attached to the complaint."  *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d at 157.  The exhibit provides additional factual detail not referenced in the complaint.  The Court does not consider it to be integral to the complaint.  This conclusion does not have an impact on the Court's analysis of the motion, which would be the same even if the Court considered the content of this exhibit.

### III.    DISCUSSION

#### A.    Breach of Contract Claim

The plaintiff's breach of contract claim is adequately pleaded.  The parties' exchange of emails did not manifest an agreement to amend the Engagement Letter.  However, the complaint pleads sufficient facts that support the existence of an unwritten agreement to modify the Engagement Letter.

---

[7] The slide deck does not list MaxEn as "the" contact person for the transaction:  it lists both Ms. Bodoin and Mr. Margulis.

### 1.    Breach of Contract Under New York Law

The Engagement Letter is governed by New York law.  Under New York law, to state a claim for breach of contract "the complaint must allege:  (i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages." *Orlander v. Staples, Inc.*, 802 F.3d 289, 294 (2d Cir. 2015) (quoting *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 142 (2d Cir. 2011)).  "When interpreting a contract, our 'primary objective is to give effect to the intent of the parties as revealed by the language of their agreement.'" *Chesapeake Energy Corp. v. Bank of N.Y. Mellon Tr. Co.*, 773 F.3d 110, 113–14 (2d Cir. 2014) (ellipsis omitted) (quoting *Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 232 F.3d 153, 157 (2d Cir. 2000)).  "The words and phrases in a contract should be given their plain meaning, and the contract should be construed so as to give full meaning and effect to all of its provisions." *Id.* at 114 (brackets omitted) (quoting *Olin Corp. v. Am. Home Assur. Co.*, 704 F.3d 89, 99 (2d Cir. 2012)).

As a "threshold question," courts must consider if "the terms of the contract are ambiguous." *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's*, 136 F.3d 82, 86 (2d Cir. 1998) (citations omitted).  "Whether or not a writing is ambiguous is a question of law to be resolved by the courts." *Orlander*, 802 F.3d at 294 (quoting *W.W.W. Assocs., Inc. v. Giancontieri*, 77 N.Y.2d 157, 162 (1990)).  "Ambiguity is determined by looking within the four corners of the document, not to outside sources." *CVS Pharmacy, Inc. v. Press Am., Inc.*, 377 F. Supp. 3d 359, 374 (S.D.N.Y. 2019) (quoting *JA Apparel Corp. v. Abboud*, 568 F.3d 390, 396 (2d Cir. 2009)); *see also Brad H. v. City of New York*, 17 N.Y.3d 180, 186 (2011) ("Ambiguity is determined within the four corners of the document; it cannot be created by extrinsic evidence that the parties intended a meaning different than that expressed in the agreement . . . .").

Courts consider a contract unambiguous when it has "a definite and precise meaning, unattended by danger of misconception . . . and concerning which there is no reasonable basis for a difference of opinion." *Olin Corp.*, 864 F.3d at 99 (2d Cir. 2017) (quoting *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir. 1989)). Conversely, "[a] contract is ambiguous under New York law if its terms could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp.*, 830 F.3d 152, 156–57 (2d Cir. 2016) (quoting *Chesapeake Energy Corp.*, 773 F.3d at 114). "The language of a contract . . . is not made ambiguous simply because the parties urge different interpretations." *Oppenheimer & Co. v. Trans Energy, Inc.*, 946 F. Supp. 2d 343, 348 (S.D.N.Y. 2013) (internal quotation marks omitted) (quotation omitted).

Courts analyze ambiguity using the "normal rules of contract interpretation: words and phrases should be given their plain meaning and a contract should be construed so as to give full meaning and effect to all of its provisions." *Orchard Hill*, 830 F.3d at 157 (internal quotation marks omitted) (quoting *Orlander*, 802 F.3d at 295); *see also Brad H.*, 17 N.Y.3d at 185 ("To determine whether a writing is unambiguous, language should not be read in isolation because the contract must be considered as a whole."). But a court applying New York law "may neither rewrite, under the guise of interpretation, a term of the contract when the term is clear and unambiguous, nor redraft a contract to accord with its instinct for the dispensation of equity upon the facts of a given case." *Bank of N.Y. Mellon v. WMC Mortg., LLC*, No. 12-cv-7096 (DLC), 2015 WL 2449313, at *2 (S.D.N.Y. May 22, 2015) (quoting *Cruden v. Bank of N.Y.*, 957 F.2d 961, 976 (2d Cir. 1992)). Rather, "a written agreement that is complete, clear and unambiguous on its face must be enforced

according to the plain meaning of its terms." *MHR Cap. Partners LP v. Presstek, Inc.*, 12 N.Y.3d 640, 645 (2009) (internal quotation marks omitted).

On a motion to dismiss, "a district court may dismiss a breach of contract claim only if the terms of the contract are unambiguous." *Orchard Hill*, 830 F.3d at 156; *see also Eternity Glob. Master Fund Ltd. v. Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 178 (2d Cir. 2004) ("[I]f a contract is ambiguous as applied to a particular set of facts, a court has insufficient data to dismiss a complaint for failure to state a claim."). In other words, courts are not "obliged to accept the allegations of the complaint as to how to construe a contract," but they "should resolve any contractual ambiguities in favor of the plaintiff on a motion to dismiss." *Maniolos v. United States*, 741 F. Supp. 2d 555, 567 (S.D.N.Y. 2010), *aff'd*, 469 F. App'x 56 (2d Cir. 2012) (internal quotation marks omitted) (quoting *Subaru Distrib. Corp. v. Subaru of Am., Inc.*, 425 F.3d 119, 122 (2d Cir. 2005)).

### 2. MaxEn's Entitlement to a Success Fee Under the Engagement Letter Requires that Mr. Friedland be Listed as a Targeted Investor

The parties do no dispute that the Engagement Letter requires the payment of a success fee only if Mr. Friedland was included in the list of targeted investors included in the Engagement Letter. That is a reasonable position because the scope of MaxEn's engagement is unambiguously limited to "raising capital from the list of target investors . . . set forth below." Engagement Letter at 6. And during the fee tail period, MaxEn earns a success fee only as a result of an investment by one of the listed investors. *Id.* .Mr. Friedland was not included in that list. As a result, MaxEn can succeed in its claim for breach of express contract only if the list of target investors was effectively amended to include Mr. Friedland.

### 3. The Email Exchange Is Not An Agreement to Amend the Engagement Letter

The email exchange between Ms. Bodoin and Mr. Margulis did not amend the Engagement Letter because it does not manifest mutual assent to modify the agreement. Under New York law,

parties may modify a contract "by another agreement, by course of performance, or by conduct amounting to a waiver or estoppel." *CT Chems. (U.S.A.) v. Vinmar Impex, Inc.*, 81 N.Y.2d 174, 179 (1993). "Fundamental to the establishment of a contract modification is proof of each element requisite to the formulation of a contract, including mutual assent to its terms." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 783 (2d Cir. 2003) (quoting *Beacon Terminal Corp. v. Chemprene, Inc.*, 429 N.Y.S.2d 715, 718 (2d Dep't 1980)). "To create a binding contract, there must be a manifestation of mutual assent sufficiently definite to assure that the parties are truly in agreement with respect to all material terms. . . . Generally, courts look to the basic elements of the offer and the acceptance to determine whether there is an objective meeting of the minds sufficient to give rise to a binding and enforceable contract." *Agosta v. Fast Sys. Corp.*, 26 N.Y.S.3d 534, 536 (2d Dep't 2016).

The Court can determine as a matter of law whether a written instrument manifests mutual assent to modify an agreement. "While it is the responsibility of the court to interpret written instruments, where a finding of whether an intent to contract is dependent as well on other evidence from which differing inferences may be drawn, a question of fact arises." *Id.* "Under traditional principles of contract law, questions as to what the parties said, what they intended, and how a statement by one party was understood by the other are questions of fact; however, the matter of whether or not there was a contract, in light of the factual findings on these questions, is an issue of law." *Ronan Assocs., Inc. v. Loc. 94-94A-94B, Int'l Union of Operating Engineers, AFL-CIO*, 24 F.3d 447, 449 (2d Cir. 1994).

The Email Exchange does not signal an intention to modify the Engagement Letter. Neither email in the exchange even mentions the Engagement Letter, much less an intention to amend it. In his response, Mr. Margulis answers "Agreed" in response to Ms. Bodoin's email. Ms. Bodoin's email contained a statement and a question. The most reasonable understanding of Mr. Margulis' "Agreed" is as a response to the question posed by Ms. Bodoin to him. Email Exchange

("Maybe it is better not to co-mingle with Standard so he can stay focused on PL?").  But regardless of to which of those statements Mr. Margulis' agreement applied, it was not an acceptance of an offer to amend the Engagement Letter.  The first statement was a "reminder" to send the slide deck to Mr. Friedland.  To the extent that Mr. Margulis' response responded to the reminder, it was an agreement to send a slide deck—not to amend the Engagement Letter.  To the extent that Mr. Margulis was instead responding to the question embedded in Ms. Bodoin's email, it was an agreement to her question about his view regarding a potential course of conduct, not an agreement to do anything, much less amend the Engagement Letter.

### 4. Plaintiff Plausibly Pleads Amendment By Course of Conduct or Estoppel

Plaintiff has adequately pleaded facts that support the inference that the Engagement Letter was amended as a result of the parties' course of conduct, notwithstanding the no-oral modifications provision of the Engagement Letter.  As described above, "under New York law, parties may modify a contract by another agreement, by course of performance, or by conduct amounting to a waiver or estoppel."  *Dallas Aerospace, Inc.*, 352 F.3d at 783 (internal quotation marks and citation omitted).  "Modifications of written contracts may be proved circumstantially by the conduct of the parties subsequent to the agreement."  *Kamhi v. East Coast Pain Management, P.C.*, 177 A.D.3d 726, 727 (2d Dep't 2019); *see also* 22A N.Y. Jur. 2d Contracts § 475 (same).  Therefore, "[p]arties to a contract are able to alter or waive portions of an agreement by their course of conduct . . . ."  *Echevarria v 158th St. Riverside Drive Housing Co.*, 979 N.Y.S.2d 294, 295 (1st Dep't. 2014).

However, as discussed above, the Engagement Letter contains the Written Modifications Only Clause, which states, in pertinent part, that "[n]o purported waiver or modification of any of the terms of this Agreement will be valid unless made in writing and signed by the parties hereto cannot be modified or amended except in writing signed by both Parties and specifically referring to this Agreement."  Engagement Letter at 9.  This provision is enforceable under N.Y. Gen. Oblig.

Law § 15-301(1) ("§ 15-301") which "places this type of clause on the same footing as any other term in a contract." *Israel v. Chabra*, 12 N.Y.3d 158, 167 (2009). While § 15-301 expressly references only limitations on oral modifications, "a no-oral-modification clause and a broad merger clause bars any claim based on an alleged intent that the parties failed to express in writing." 22A N.Y. Jur. 2d Contracts § 478.

"Despite § 15-301, New York recognizes oral modification or waiver of a contractual provision, but only under limited circumstances, specifically, (1) 'when there has been partial performance of an agreement to modify, so long as the partial performance is unequivocally referable to the oral modification,' or (2) 'when one party has induced the other party to rely on an oral modification' such that 'the first party may be equitably estopped from invoking the requirement that any modification be in writing.'" *DiStefano v. Maclay*, 102 F. App'x 188, 189 (2d Cir. 2004) (summary order) (quoting *Towers Charter & Marine Corp. v. Cadillac Ins. Co.*, 894 F.2d 516, 522 (2d Cir. 1990)).

Construed in the light most favorable to Plaintiff, the facts pleaded in the complaint support the inference that the contract was amended to add Mr. Friedland as a result of the parties' course of conduct. Pure Lithium requested that MaxEn work to solicit an investment from Mr. Friedland. Ms. Bodoin's email does so expressly, and in it, she also nods toward a prior conversation about the topic. Over the course of months thereafter, MaxEn worked to solicit an investment from Mr. Friedland, working alongside executives from Pure Lithium. Given that the scope of MaxEn's engagement under the Engagement Letter was limited to working to develop investments from listed target investors, an inference could be drawn from the circumstantial evidence pleaded in the complaint that the parties had agreed to add Mr. Friedland to that list.

As alleged, MaxEn partially performed under the suggested amendment by virtue of its efforts to solicit an investment from Mr. Friedland over the ensuing months. And the complaint

plausibly pleads that MaxEn's conduct was unequivocally referable to the alleged modification: without the modification, MaxEn would, as pleaded, have no reason to do substantial work at Pure Lithium's request to solicit the investment from Mr. Friedland.  Because the plaintiff has pleaded that the parties' course of conduct established a modification of the contract, and that its partial performance of that agreement as amended was unequivocally referable to the modification, the motion to dismiss plaintiff's claim for breach of contract must be denied.

### B.    Unjust Enrichment and Quantum Meruit

Defendant's motion to dismiss Plaintiff's unjust enrichment and quantum meruit claims is denied because those claims are pleaded in the alternative.  Under New York law, unjust enrichment and quantum meruit claims are analyzed together as a single quasi-contract claim.  *See Mid–Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir. 2005).  This is because "quantum meruit and unjust enrichment are not separate causes of action; rather, unjust enrichment is a required element for an implied-in-law, or quasi contract, and quantum meruit, meaning 'as much as he deserves,' is one measure of liability for the breach of such a contract." *Di Simone v. CN Plumbing, Inc.*, No. 13–cv–5088, 2014 WL 1281728, at *6 (E.D.N.Y. Mar. 31, 2014) (internal quotation marks omitted) (*quoting Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 768 F. Supp. 89, 96 (S.D.N.Y. 1991) *rev'd on other grounds*, 959 F.2d 425 (2d Cir. 1992)).  Unjust enrichment is "a New York common law quasi-contract cause of action requiring the plaintiff to establish:  '(1) that the defendant benefitted; (2) at the plaintiff's expense; and (3) that equity and good conscience require restitution.'" *Myun-Uk Choi v. Tower Research Capital LLC*, 890 F.3d 60, 69 (2d Cir. 2018) (quoting *Kaye v. Grossman,* 202 F.3d 611, 616 (2d Cir. 2000)).

"'[T]he existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter.' . . .  '[I]t is impermissible . . . to seek damages in an action sounding in quasi contract where

the suing party has fully performed on a valid written agreement, the existence of which is undisputed, and the scope of which clearly covers the dispute between the parties.'" *Ball v. Cook*, No. 11 Civ. 5926 (RJS), 2012 WL 4841735, at *10 (S.D.N.Y. Oct. 9, 2012) (Sullivan, J.) (internal citation omitted) (quoting *Clark-Fitzpatrick, Inc. v. Long Island R. Co.*, 516 N.E.2d 190, 193 (N.Y. 1987)). "A plaintiff can plead unjust enrichment as an alternative claim to breach of contract, but only if there is 'a bona fide dispute concerning existence of a contract or whether the contract covers the dispute in issue.'" *MF Glob. Holdings Ltd. v. PricewaterhouseCoopers LLP,* 43 F. Supp. 3d 309, 317 (S.D.N.Y. 2014) (quoting *Fantozzi v. Axsys Techs., Inc.*, No. 07 Civ. 02667 (LMM), 2008 WL 4866054, at *7 (S.D.N.Y. Nov. 6, 2008)).

Each of Plaintiff's unjust enrichment claim and quantum meruit claims is expressly pleaded "in the alternative in the event that it is determined that the services MaxEn provided to Defendant were not covered by the Agreement." Compl. ¶ 49 (quantum meruit); ¶ 57 (unjust enrichment). MaxEn asserts these claims in the alternative, pleading unjust enrichment and quantum meruit only to the extent that the Engagement Letter does not govern the subject matter of its claim. Here, there is a substantial dispute regarding whether the Engagement Letter governs this dispute, because it only does so if the Engagement Letter was effectively amended. Therefore, Plaintiff's unjust enrichment claim and quantum meruit claims, as pleaded, are not duplicative.

### C. Breach of Implied Contract

Defendant's motion to dismiss Plaintiff's claim that Defendant breached an implied contract is denied because it cannot be determined at this point that an express agreement existed covering the same subject matter. "Under New York law, '[a] contract implied in fact may result as an inference from the facts and circumstances of the case, although not formally stated in words, and is derived from the 'presumed' intention of the parties as indicated by their conduct.'" *Leibowitz v. Cornell University*, 584 F.3d 487, 506–07 (2d Cir. 2009) (*quoting Jemzura v. Jemzura*, 36 N.Y.2d 496, 504

(1975)), *superseded by statute*, Local Civil Rights Restoration Act of 2005, N.Y.C. Local L. No. 85, as

recognized in *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013).  "A

contract implied in fact is as binding as one that is express, and similarly requires such elements as

consideration, mutual assent, legal capacity and legal subject matter."  *Id.* (internal quotations

omitted).

Under New York law, "[a] contract cannot be implied in fact where there is an express

contract covering the subject matter involved."  *Julien J. Studley, Inc. v. N.Y. News, Inc.*, 70 N.Y.2d 628,

629 (1987).  Thus "the theories of express contract and of contract implied in fact . . . are mutually

exclusive."  *Bowne of New York, Inc. v. Int'l 800 Telecom Corp.*, 576 N.Y.S.2d 573, 574 (1st Dep't 1991).

"Hence, courts regularly dismiss implied-in-fact contract claims where an express contract governs

the same subject matter as the purported implied contract."  *Twelve Sixty LLC v. Extreme Music

Library Limited, a division of Sony/ATV Music Publishing*, 2018 WL 369185, at *5 (S.D.N.Y. 2018)

(collecting cases).  Still, in some circumstances, "a plaintiff may plead breaches of express and

implied-in-fact contracts in the alternative," such as when the existence or scope of the express

contract is uncertain.  *Id.*

Plaintiff's implied covenant claim should not be dismissed at this time because it is pleaded

in the alternative and it cannot be determined that an express contract covered its subject matter.

The only argument presented by Defendant in support of its motion to dismiss this claim is that the

Engagement Letter governs the subject matter of the alleged implied contract.  *See, e.g.*, D. Mem. at

10.  Plaintiff's claim, however, is clearly pleaded as an alternative to its express breach of contract

claim.  Compl. ¶ 42 ("in the event that it is determined that there was no express agreement between

Plaintiff and Defendant that governed the services . . . an implied agreement was established . . . .").

As described above, there is a substantial question regarding whether the Engagement Letter was

amended to cover the services rendered to Mr. Friedland. Therefore, the claim survives Defendant's motion to dismiss.[8]

### IV.  Conclusion

For the reasons described above, Defendant's motion to dismiss is DENIED.

The Clerk of Court is directed to terminate the motions pending at Dkt Nos. 20 and 22.

SO ORDERED.

Dated:  October 17, 2024
New York, New York

_____
GREGORY H. WOODS
United States District Judge

---

[8] Implicit in Defendant's argument is the contention that the "subject matter" of the Engagement Letter should be construed broadly to encompass any efforts by MaxEn to solicit investments in Pure Lithium. *See, e.g.*, D. Mem. at 10 ("Here, there was a clear mechanism for Plaintiff to be compensated for any alleged services provided with respect to Mr. Friedland's alleged investments: properly effectuate an amendment to the Agreement."). The "subject matter" of the Engagement Letter could be understood more narrowly to refer only to the provision of services to obtain investments from the targeted investors identified in it. The parties did not brief, and the Court need not decide, whether the "subject matter" or the express contract should be construed as broadly as Defendant contends.